The first case we're going to hear today is United States v. Dyess and Mr. Brandt. Are you ready? Good morning to the court, counsel. May it please the court, Jeff Brandt on behalf of Mr. Dyess. Six issues have been certified for appeal, quite possibly more than our time this morning will allow full addressing of each of those. Unless and until the court has a question or concerns as to one of them in particular, if we could suggest that a good start off point might be Apprendi because the discussion on that issue leads to at least two other of the issues. I don't think there's a legal question of whether Apprendi applies prospectively here because of when Apprendi was decided and when Mr. Dyess' conviction became final. No question that the maximum then with Apprendi applying is 20 years and that he was sentenced to life. We submit that this is not procedurally barred for being failure to raise it in the district court or in the brief as Mr. Dyess multiple times, both through his counsel and his own pleadings, asked that the district court apply Apprendi. Nor is there any ruling by this court in the final, in the opinion, not the original remand, but the opinion finding the Apprendi error was waived. There was no Apprendi ruling. The court's decision mentioned the word Apprendi, but when reaching a decision, it reached the Booker error. In this court's case law, Gore is one of the cases we cited, talks about how there's an Apprendi ruling, there's an Apprendi error, there's Booker error. The court said there's no Booker error and if there were, it was cured on remand. There was Apprendi error and that could not have been cured with how this remand was handled because of course, we still have the indictment, not charging drug amount. We don't get to a jury finding beyond the reasonable doubt and we've named a few of the cases in the brief, happy to cite them again here at oral argument on cases around the same time. As this case was up on direct appeal, had Apprendi been applied and ruled on, very similar cases where the court says, no, that's an Apprendi error, remand, send it back. We only had Jones out and we had a circuit precedent that didn't make it an element of the offense. Apprendi came and then we had a case that made it an element of the offense. Yes. So when we were reviewing the first time, it seems to me this has got to be a plain error analysis. If we look at additional arguments that we get to, like where this leads to whether counsel is ineffective for failing to make an objection about the guilty plea, that makes the timing more difficult for Mr. Dias, as you've said, Judge Niemeyer. By the time, remember that this case comes up on appeal and gets remanded and then we have time for an evidentiary hearing in which Mr. Dias and his counsel are both saying, Apprendi, Apprendi, Apprendi, please make an Apprendi ruling. Give me Apprendi for a new sentencing hearing. By the time the court gets this case and renders an opinion, now we're seeing we all know we had Jones, we had Apprendi, this court's case starts with an H that I can't remember off the top of my head. Thank you. Plus the Twitty, the Ferguson, the Brown-Pervis. I can't promise you those are exact the same time, but these are cases that we researched and put in the brief because it's around that same time. Moving on to the second Apprendi-related error. The government's brief in responding to Apprendi error does a nice job of helping us show why counsel may have been ineffective in failing to object or take steps that prejudiced Mr. Dias because the government, and correctly pointing out, here's why this court shouldn't rule on Apprendi because the attorney's not citing it earlier. The attorney's not bringing up here, bringing up there. He couldn't have brought it up. We respectfully submit that because Ms. Jones is coming out in March 2009 and he's pleading guilty. But Jones wasn't construed that way. As a matter of fact, we didn't construe it that way. In order to impute responsibility on the attorney, you're going to have to get beyond Apprendi and into our interpretation where we applied that and made it an element of the offense. What he gets is maybe some looking back and see whether any injustice was done. There we look at the weight of the evidence and the amount involved just like they did in Cotton. The case may be resolved. This issue can be resolved through Apprendi. I feel confident that this issue was certified for a good reason and it includes that, yeah, the attorney wouldn't have had a slam dunk. It wasn't an uncontested slam dunk that this was correct. But grounds existed for making an objection. I didn't see anybody raising that issue before. Everybody assumed that the quantity of drugs was controlling the sentence and that is the way Congress actually wrote it. They headed up the Section B as a penalty. I never saw a case coming up where an attorney raised that point before Apprendi. Well, by the time Mr. Diaz is being sentenced, the Apprendi briefs are being written. So somebody is able to come up. Briefs are being written? Well, I mean, the issue is being developed in the federal courts. No, you have to have a decision. I mean, when was Apprendi was decided after the sentence? June 2000. Part of my briefs respectfully submits that one of the duties of counsel was that August 1999 and the Supreme Court briefs were finalized in February. Did Apprendi come out while the first, while the direct appeal in this case was pending here? Before, well before. It came out? Before this court's even remanded. The Apprendi was out? Yeah. Well then, so why didn't our decision take care of it then? And why didn't your remedy assert or motion for a rehearing? You thought we missed it in our first decision? We're submitting that it was not ruled upon. Then why didn't you, why wasn't your avenue not a 2255 but a motion for rehearing or assert petition? That would have been a much better route. Why isn't that the appropriate ground? Because counsel at that time did not take it. And that's why Mr. Dyess comes back with a 2255 saying that's what should have been done. Right, that's the ineffectiveness. Did you raise Apprendi, was Apprendi raised on the, in the appeal? In the brief, absolutely. In the direct? Yes, Your Honor. And we ruled on it. We're submitting that this court. So you're saying that the Apprendi issue was raised on direct appeal as an issue to this court? Yes, Your Honor. And we affirmed notwithstanding that in the brief? The court did affirm the district court's sentence. Doesn't that end it? Yeah, that ends it, doesn't it? We're submitting it's not procedurally barred because the court didn't rule on that particular issue. We did, didn't we affirm the conviction? Yes, Your Honor. How did we not rule on it then? You're suggesting we didn't have a specific sentence in the order ruling on it? That's correct. That's not required, is it? No. Our strongest argument on why the Apprendi issue is still before this court is that it was raised. But it was raised and then the conviction and the sentence were affirmed over that issue having been raised. Correct. And your argument is we didn't address it because we didn't have a specific sentence in the opinion? Absolutely our strongest argument there is. I know, but. Yes, that's our argument. But that's not the ineffectiveness of counsel. That's the ineffectiveness of the Court of Appeals. I'm glad you said it, not me. I know. I didn't say it was right. I'm saying that's your claim. I'm saying that's your claim. If you'd like me to go on to the prejudice of the court's ineffective assistance, I'd be happy to. Yeah, there's certainly some deficiencies in raising the Apprendi argument, but there has to be the jumping off point because we've got an inmate. How can it be if he raised it? How can it be what, Your Honor? Your argument is that he should have raised it, but he did raise it. The ineffective assistance of counsel arguments are that trial counsel is ineffective then to fail to advise his client. But the trial counsel and then remand counsel, there's two separate ineffective assistance arguments. I'm sticking with the Apprendi issue. You said counsel was ineffective for not raising it. We have not submitted an argument in this appeal saying direct appeal counsel was ineffective for not raising it because he did. That is not one of the ineffective assistance of counsel arguments. When I talk about Apprendi, I'm talking about flat out Apprendi applies and there's Apprendi error. When we get to ineffective assistance of counsel, the argument is then that trial counsel failed to take steps once it was clear that this was an argument that could be made. What we decided and saying that we didn't do it properly because we didn't explain what we did. And Judge Shedd has told me to move on very cogently. I don't know what else I could say. I may have pointed out why that argument is not going very far, but I didn't suggest you move on. I'm glad to have you do it. Thank you, Judge Shedd. I would suggest then that the argument, the next argument is that counsel is ineffective for failing to take steps to say, Mr. Dyes, we've got to withdraw your guilty plea. This is trial counsel first. Should have taken steps to have Mr. Dyes take steps to move to withdraw his guilty plea using the more factors. We submit those factors apply. Case law, I think it's Sparks from this court says that most important of those factors are the first, second, and fourth. Those first, second, and fourth factors would be, yeah, it was not knowingly and intelligently entered because he didn't know his statutory range. He did not have the close assistance of counsel. This is an ineffective assistance of counsel argument and legal innocence of an offense that has a statutory range that goes up to life. Anything past 20 years. And then the second ineffective assistance of counsel argument is counsel on remand. Same thing. Move to withdraw the guilty plea based upon the more factors now that it's abundantly clear that Apprendi applies. This is 2005? This is after this court applies to Mr. Dyes' case to demonstrate that his sentence is improper. You have to go then address the plain error analysis. I'll respect that decision. I would also respectfully submit that it's not. I mean, they had an identical circumstance there. I believe that the closer cases to this case than Cotton are the cases that we cited in the brief where the issue. That was a Supreme Court case. Yes, I understand. But this court is using Cotton in cases like this one saying this is not harmless. My point is in Cotton, the amount was not stated in the indictment. But the man was sentenced based on a finding that there was drugs beyond the 1.5 kilograms. Yes, Your Honor. And the court said that that was not plain error. Or they were going to notice the error. Or a harmless error. This is why we're citing cases about the same time as Mr. Dyes' case, I believe after Cotton, that's saying, okay, we could apply plain error, but there are cases where the court nevertheless vacates the sentence and remands. I would also respectfully submit that plain error standard would be wrongly applied when by the time this court is ruling on the Apprendi issue in the first instance, the defendant has raised it in the district court. And that's what plain error is all about. Plain error rule says, don't bring an issue to us that you haven't raised below and the district court judge hasn't ruled on. In this case, the issue was addressed. On the motion, on the failure to move to withdraw the plea, he did move to withdraw the plea, did he? On completely separate grounds. There were two motions to withdraw the plea, neither one having anything to do with Apprendi, the guilty plea, or the sentence being in excess of the statutory max. The case was closed. Say again, Your Honor. We addressed the motion to withdraw the plea in our first Dyes' case. But not on these grounds. Well, the only grounds he had. He didn't have it on a, whatever was addressed at that point was raised. And now the case is final and you're coming back and suggesting, what's the ground that you want him, when did you want him to file a motion to withdraw his plea? After this court heard the case, heard the prosecutorial misconduct, remands it to the district court, very broadly, with an expectation there could be another sentencing hearing. Except there wasn't. What we did is we asked Judge Hayden or Judge Faber to look at the effect, take evidence and look at the effect of this agent's misconduct. And that was done. Now, maybe there was room for doing other things, but there certainly wasn't room to open up the case for some other reason. Judge Hayden's own order suggests that there were reasons to reopen. He said, I consider this a pre-sentencing posture, because I could get to the point of a new sentencing hearing. Judge Faber, who took the case, said he was going to hear, and then based on what he heard, decided whether or not there would be a resentencing. He heard, pursuant to the remand, and said, no further hearing. That's correct. But my point was responding to Judge Niebuyer's question about, was there grounds to believe that this was, there was a time to file a motion to withdraw, and my point was the language of the earlier district court judge saying, I consider this a typical of a pre-sentence posture of the case. Thank you. Thank you, Mr. Frank. Mr. Peterson. Thank you, Your Honor. May it please the court. Good morning. My name is Kim Peterson, and I represent the United States. Can the court hear me okay? Okay. In this case, Dias' convictions and sentence should be affirmed, as the evidence of drug quantity was overwhelming and essentially uncontroverted at both the sentencing and at the evidentiary hearing on remand before Judge Faber. While Dias contested the- The court said clearly over 1.5, but was there an amount that was- Yes, Your Honor. There was a seizure of over 1.1 kilograms of crack cocaine during the course of the investigation. In addition, there was at least 5 kilos of powder cocaine, which was seized from the car of one of the cooperating defendants at the time. In addition, there was over $300,000 in drug proceeds, which were handed over to the government during the investigation, as well as the seizure of over 12 firearms during a number of searches at- The answer to the drug amount is how much? It's over 1.5 kilograms, which includes both the physical 1.1 kilos of crack- You know what the amount is, rather than just over 1.5? Was there a calculation? Anybody calculate this into grams? Well, 1,500 grams of crack cocaine. No, no. It was more- All you said, it was- We got that. Right. You said it was more than that. How much more? Does the record reflect? Was it 6 kilograms? 250 kilograms? If you know, you know, and if you don't, you don't. What the record establishes is that, according to Leon Mitchell, who was one of the drug co-conspirators, there was between 75 to 100 kilograms of powder cocaine, and that's in the joint appendix at 372. More than half of that was converted into crack cocaine. So if you use the numbers, up to 50 kilograms were crack cocaine, and 100 to 200 pounds of marijuana, again, it's in the joint appendix at 372. I know. My question was somewhat- I mean, if it's clearly beyond the 1.5, it helps your case, and I was asking how much beyond. The court found beyond the 1.5, and I was looking for a number. Have you ever reached a number as to how many kilograms of crack? Sure. I mean, there's at least 50 kilograms of crack cocaine, which is horrible at math, but, I mean, 1.5 is your threshold. Fifty kilograms of crack is exponentially larger than that. But did Judge Hayden consider this to be a pre-sentencing posture when it was remanded to him? Actually, I think his statement was a little bit more equivocal than that, Your Honor, and I think he allowed for the possibility that at the early stage, when the matter was remanded back to Judge Hayden, there was a lot of uncertainty in terms of what was going on. As the court may recall from the record, the government had made a series of disclosures about the misconduct of the investigator. In addition to that, in support of the defendant's motions for relief, the defendant filed two affidavits, which later turned out to be false. They were fabricated by him. So the judge was in a position of, let's figure out what we're going to do in this case to get to the bottom of things. And so what Judge Hayden... Which means he put it in a pre-sentencing posture. Possibly, after the finding, he may re-sentence him, correct? That's correct, but it was dependent. Absolutely, fair. Dependent upon what is discovered in evidentiary considerations, but that's what I'm saying. He put it in a pre-sentence posture, and they raised a prending. And it was his intent to get to that, but it was never ruled upon by anyone. Your Honor, that is correct in the sense that Judge Hayden wanted to bifurcate the proceedings. And what he said, let's have an evidentiary hearing first. Right. If the evidentiary hearing indicates that there should be a re-sentencing, then and only then will we get to that. Absolutely. That's why it's pre-sentence posture, that point, in terms of not that he's going to automatically re-sentence him, but it's pre-sentencing as much as what I'm doing now may very well require re-sentencing him. I think it was a conditional. He never vacated the sentence, did he? He did not. That's why the sentence remained in effect. It always remained as part of the judgment, and he had the authority to open it up if it was found necessary. That's right, and we were in the fact-finding stages. If it had been post-sentencing, if he described the conditions as post-sentencing, aren't you very much more restricted in what motions are available and what you can do post-sentence? Absolutely. So you see that as pre-sentencing is just the judge going, what the heck did we do? And by the way, let me say, when I was a district court judge, I would get orders and mandates from the Circuit Court of Appeals. I couldn't quite figure out what they wanted me to do. But now that I've gotten wiser and I'm on this court, I know our orders are crystal clear, and everybody ought to know exactly what they ought to do. But you would get it, and so maybe he just goes, what do we do? It can't be post-sentencing because that's so restricted in what a defendant can do that I'm going to put it in pre-sentencing. I'm not re-sentencing. It's pre-sentencing just to open the door to let you all, let me see what might be appropriate, and then I'll work through it and have a time to consider it. Now, that does open the door for the argument that he's taking the whole thing back sort of ab initio and so make your arguments about everything you want to, but the subsequent actions don't really indicate that's what he meant to be doing. I think that's a fair characterization of what was in the judge's mind at the time when all of these events were happening. As the court recalls, the order of remand, it was basically putting a lot of discretion in the district court. We remand for any further proceedings that may be just and appropriate. Just, right. Well, I don't think it's just. You don't want to stay away from justice, don't you? No, absolutely not, Your Honor. I don't want to misquote the court's order. But I think that certainly implicitly, if not explicitly, justice was the basis for the remand to find out. A good segue to my question, why isn't the government joining really Mr. Deese here? This is a corrupt case. Absolutely, Your Honor. And the government was corrupt. The government meaning not counsel, I'm not talking about you, but the government, the prosecutorial body, the lead investigator, was corrupt, wasn't he? Absolutely, Your Honor. And when the judge heard the testimony, because, see, we can talk about 1.5 kilograms or how much over, and that gets you up to the minimum of 20, but the question is what's necessary to get a person to life? And he got the death sentence, if you will, the maximum. And at that time he didn't know he was dealing with a corrupt police officer who was the lead investigator, did he? Your Honor is very right to point out the concerns, and I remember at the direct appeal, the oral argument, Your Honor was also concerned with the corruptness of this agent. And the government shares that concern, Your Honor. This is very, what he did was reprehensible. We are not backing away from that. And let me tell the court, if it's not clear from the record, what the government did, as the court may recall, the government prosecuted that lead agent criminally in federal court, and he entered a plea of guilty. What we also did during the remand proceedings, and not at the direction of Judge Hayden or Judge Faber, but what we did on our own was we convened a special grand jury in Charleston, West Virginia, and what we did was we investigated William Hart, who was the corrupt agent. We investigated his partner. We investigated Calvin Dias, who orchestrated, who fabricated fake affidavits, trying to make the government's misconduct look greater than it was. We ended up prosecuting two of the co-conspirators in this case for additional criminal charges. The officer who was corrupt, did he plead guilty or was he convicted? He did plead guilty, Your Honor. And he was sentenced to what? I don't know the answer to that, Your Honor. You don't know that? We know this, well, after you got a conviction, did you bring him back and make him testify? Because he took the fifth when, in this action, tried to get some evidence as to, so you were foreclosed as to what the spread of the taint was by his constitutionally protected right to take the fifth, right? Correct? He took the fifth, did he not? He did. And then after post-conviction, did you bring him back and say, look, you've lost the fifth now, you've been convicted, and said now testify as to how you tainted this case? No, we did not. That would have been a good way to get some recompense, wouldn't it? Well, I guess that really has no bearing to a degree on the issues that are before the court. It doesn't. At the basis of the remand was to find out the extent of the taint. That's right. And you were foreclosed by a Fifth Amendment. He took advantage of the Fifth Amendment, which he had the right to, but post-conviction, you could have brought him back and said, you don't have the fifth now, and you have contempt power then, don't you? That's correct, Your Honor. That's what the court does, and you could ask the court to use contempt to say, right, but you didn't do that. Judge Faber heard all of that, and we reviewed all of that, and all these arguments were presented to us. Judge Faber heard that he took the fifth, that's all. Judge Faber had a two-day evidentiary hearing in which he heard the testimony that it was the defense's burden to show that the underlying testimony was tainted. And so a number of witnesses were called by the defense in that case. As the court recognized, Officer Hart was called and invoked his fifth. Ursula Rader, the defendant's ex-wife, was called and testified. Officer George Henderson testified to some degree and invoked the fifth, and there are other witnesses available. But at the end of the day, the fact that Officer Hart is reprehensible and he did something not only unprofessional but morally wrong, that did not taint the rest of the government's evidence. Yeah, I hear your outrage and you convened a special grand jury, but you don't know what his sentence was? Your Honor, I believe he – How could it be that you would stand here on that key figure and not, just from general information, not know what his sentence was? I apologize to the court. I did not focus on that. You didn't focus on it? You never heard it? You just don't know? You were just standing there, you were going, let me tell you what we did. We convened a special grand jury. He's reprehensible. He pled guilty. And his sentence says, I don't have the foggiest notion. Does it? Wouldn't you just know that out of the normal course? Did you have any involvement with that grand jury? I did not. With the grand jury, yes, sir, but not with the prosecution of the officer. And that grand jury indicted him, the officer? No, sir. Okay. He pled to criminal information that was prosecuted by another U.S. attorney's office. But you just sort of had some wall put up that you don't know, you didn't read into the paper or anything? Your Honor, I believe, to be honest, he pled to misappropriation of government funds of $1,000 or less, what the ultimate sentence was. Misappropriation of government funds? What about obstruction of justice? Did you add them up like you do everybody else with all these enhancements like you normally do, the government does? And information for misappropriation of funds? Your Honor, it was based on what evidence the government could prove at the time. Prove at the time? Yes, Your Honor. Well, you came here and represented, you found out that he was sleeping with the man's wife, and here's a person that he wrote the script for what she testified to, did you find that out? He coached her on how to testify. And that's misappropriation of funds? Well, it was concerning the amount of drug proceeds that he allowed her to keep and did not disclose. But more than that, you have evidence that he orchestrated, excuse me, counsel, you have evidence that he orchestrated the whole dog and pony show that ended up the man getting life. I would disagree with the court's characterization. Okay, you don't have evidence that he was part of orchestrating that testimony? What the evidence shows from the remand hearing is that he assisted her in her testimony at the sentencing hearing. He showed her the transcripts of grand juries from other witnesses and that he created a physical exhibit concerning the amount of drugs that she had seen her husband cook in an apartment. That testimony was actually corroborated by another eyewitness. Came back and said that she didn't recall that she testified to that amount. And that's just in no charge? The only evidence of that comes from the ex-wife. There's no other evidence. Tell me this, why was the government, in terms of justice, a case to this level of corruption that you now know, why is it not just to have a rehearing, a resentencing, with a judge that knows what the evidence is as opposed to the judge not even knowing about Mr. Hart's situation? Well, Judge Faber actually had the benefit of reviewing the grand jury transcripts from Officer Hart's testimony before the grand jury, Ursula Rader's testimony, Henderson's testimony, and other information that was not available to Judge Hayden at the original sentencing. Didn't we review all that before? I'm sorry, Your Honor? Didn't we review all of that before? You did, I believe. Did they appeal Judge Faber's findings? Yes, because he made a written order, about 10 pages, which explained to the court what actually he reviewed and included the transcript from the original hearing. It included the pre-sentence investigation report. It included the evidentiary hearing, which had a full transcript. It included the facts of the prosecution of Ben Green and Lori Cummings, who admitted that they fabricated their recantation of their earlier original testimony at the direction of this defendant. It included, I'm trying to think what else specifically it included, but he wrote those things in his report, what he considered and what he believed to be credible and not credible. Other people testified, and they had charges against them, didn't they? That's correct. So the government had control over them too, didn't they? They wanted deals, didn't they? What they normally do. Yes, Your Honor. So what was left, you said that the untainted amount of evidence are most of the people who themselves wanted to get deals, didn't they? There are two people, they didn't testify, well, Ben Green did not testify, but his plea agreement was presented to Judge Faber for consideration. Lori Cummings testified about making drug trips for Calvin Dias to New York. She has charges against her? Yes, they both pled guilty. And she won a favorable sentence, right? That's correct, and she had a plea agreement that recorded that as well. All right, so if you take the tainted evidence as in terms of Mr. Hart, who's left that does not have criminal charges against them with matters pending? Well, you mean at the time of the evidentiary hearing? Yes. The information, the evidence that was presented, they were all co-conspirators, so they were all charged in the underlying case. So the answer is none? Actually, well, that's not correct. There was a DEA agent who testified at the original sentencing. And he saw or she saw what? He participated in the execution of a search warrant at the residence of one of the co-conspirators. Not Mr. Deese? His uncle, Orange Dias. I mean Dias, not Mr. Dias. It was at the residence. So he had no, he didn't testify as to an amount? No, it was about the guns that he had seized. The guns, right. All the people that testified about drug quantity were his drug co-conspirators. Mr. Hart was the lead investigator. That's correct. And isn't it correct in the lead investigator is in charge of really kind of orchestrating the whole case to put it together? Yes. And so you're saying that the taint is removed from finding that person committed a crime. He did commit a crime, didn't he? That's correct. As you say, at least money was appropriated, right? That's correct. But not obstruction of justice? That's correct. You agree, you really believe that? That's not obstruction of justice? But he did. That could have been a possible charge. What he was charged with was a different offense. So you gave him a lower amount. But this man gets life, and you think that's justice? I guess I'm not here to compare Officer Hart with Dias. We're here to discuss whether or not his sentence should be affirmed and whether or not there is an effective assistance of counsel. And I think these issues were addressed clearly by Judge Faber. Let me ask you this. Isn't it the normal course in most criminal prosecutions for drug amounts or drug dealing in federal courts that if not all, almost all the witnesses have some kind of plea deal with the government? Absolutely. And Judge Faber has been around for a while, hasn't he? Yes, sir. I bet he's been a district court for almost, he's been a judge for almost 25 years. And so he's used to seeing witnesses with plea deals with whatever motivation that brings to lie. He's used to seeing that and dealing with that, isn't he? That's right. It's a normal state of affairs. And your claim is, and I asked that question, I'm just surprised you didn't know. But your claim is, your argument is, that's fine. What happened in that case doesn't really have a bearing on this one for purposes of what we have to decide today, correct? That's correct. And I guess is it fair to say at the point then we were discussing this officer, what's his name, the officer who shot Hart, that we're now talking about him as a criminal defendant who had a lawyer and a right to push for the best deal he could get and poke holes in evidence as to him. And I said, is that what happened in that case? Or you just don't know? I mean, he was an officer in this case, and we can talk about what he did in this case and how it bears on our decision. But as to his criminal case, we have to switch him from law enforcement to a defendant. That's right. And he has a right to have a lawyer, and that lawyer has a right to fight the government's evidence and try to work the best deal he can too. We can't ding the criminal lawyer in that case for getting some kind of deal. I don't even know. It may not be a deal. I don't know what it is. But at any rate, I just was interested. But I take your point that you want to focus on the claims in this case specifically made in your responses to them. That's right. Have we let you give all your responses so far? A few, a couple. I just want to, you know, the court pointed out earlier that the standard here is plain error. And we do believe that the Cotton case applies. And this case is a little bit different in the sense that, you know, Calvin Dias pleaded guilty at a guilty plea. He admitted what the drug quantity was. He didn't dispute that. And that was completely normal because back in 1999, that's what people did. That was the normal practice. The government could have gone to the grand jury and, you know, noticed the certain drug quantities. But I think that the facts were so obvious at that point. I mean, Mr. Dias' trial counsel said, we have no valid defense in this case. The issue is, the strategy, what we'll do, is we'll attack things at sentencing. And that was the normal course of business. I'm glad you brought that up because you raise a, and I want you to listen to me very carefully. I know you would, but I mean, and that is this. In a sense, you're right. You're saying, okay, he pled to the amount. But in this case, wasn't it also hopes, I think it's on the record, that he was trying to cooperate that hopefully he would get 5K or Rule 35, correct? That's right. Right. So that had a lot to do with, even though he was pleading to an exposure pointed to life, it was clear that he was trying to get that. And whose discretion is it? The prosecutor. Prosecutor, right? Yes, Your Honor. And don't you rely normally a lot on the investigating as to your recommendation? Certainly. But now we know that Hart was, I think you'll agree that he was on the make for the man's wife. Do you agree with that? I agree with that, Your Honor. Matter of fact, he married her. So now we're talking about a person who gets life after pleading, and we find out the chief investigator has ostensibly a reason to get rid of him for a long time, like life, because he actually married his wife. Are they still happily married? No, Your Honor. Well, I guess one. I guess the purchase price for what you get sometimes would indicate sometimes not long-lived. That may be the case in terms of justice. It may not be here, but in the long run. But in terms of taint, you have to look at more than just whether or not these people gave the quantities. What about the taint of the fact we know what was the motive, perhaps, of the person who didn't give him the 5K? If I could respond to that, Your Honor, because the court is right that the government, through the prosecutor, is responsible for making that decision. And I would like to point the court back, though, to the history of the case, in that the defendant, from his initial debriefing, had minimized the amount of drugs involved. He said that there's 12 to 15 kilograms of cocaine, which was clearly at odds to the mounds of evidence that the government had. And he was minimizing, and that was noticed in the record. So the first get-together with the government and the defendant, he starts off on the wrong foot. He doesn't come to the table with a mindset of... What else does he do to lose his motion? His acceptance? Acceptance or motion for a downward departure. Acceptance of responsibility doesn't mean much. Well, right. Not in this situation. That's three levels of four at the most. He wanted that departure motion, didn't he? He wants both things. I know that, but I guarantee if you ask him to pick, he would pick the downward departure motion. Sure, but he wants the downward departure, but he doesn't want to work for it. I didn't say that. I'm asking you, why didn't he? Why do you... Does the record indicate why he didn't deserve it? That's all I'm asking. Okay, there are a number of factors. One, I could point to there is obstruction of justice and that the evidence showed that the defendant had sent family members to the home of his wife to encourage her not to cooperate with law enforcement. There is another episode where his nephew, Eddie Ray Dias, who was involved in the conspiracy of making drug trips with his uncle Calvin, had seen his uncle Calvin in jail, in lockup, and got word from Calvin Dias not to cooperate with law enforcement. There was another episode after the defendant had signed his plea and agreed to cooperate that he refused to testify at the upcoming trial of his uncle, Orange Dias. I mean, so there were a number of factors, plus his minimization. Judge Hayden, specifically, you look at the colloquy at the sentencing and the back and forth with defense counsel. He says, look, there's a reason why you didn't get it, and I can understand why the government doesn't want to try to meet you halfway. You basically didn't take advantage of the opportunity, and Mr. Dias himself realized that was his opportunity. And what did the judge rely upon that being the truth? Mr. Hart? No, Your Honor, it was both... Mr. Hart wasn't the one who indicated subjectively whether or not... You know, because it always is like, you know how it is, jump. Now the question is, do you jump high enough? It's the investigator who decides whether or not you jumped high enough to get your 5K. That's how it works, right? You know that. Well, it's the prosecutor. We're in charge of the investigation, and we defer to, on occasion, factual matters to the investigator if they are present during investigations, but it's ultimately the prosecutor's responsibility to control the investigation. Yeah, it is, but a large factor is the chief investigator of that case, clearly. But the factual knowledge comes from, you know... How did the judge know what the level of incorporation was? Well, the... The government told him. Correct. Right, and that government was Mr. Hart. It was the AUSA, Your Honor. The AUSA didn't... You know, the lawyers don't go out and talk to the people a lot. Yes, we do. Oh, you do? You go out and find the drugs where they are? Oh, no, sir. Well, we interview the witnesses and the defendants, and we sit in interviews with them. Were you in these interviews? Did the record indicate that you were in an interview? Oh, no, sir. I was appointed after the U.S. Attorney's Office was recused. But I can tell you as a practice, and I believe in this case, the AUSA, the line prosecutor, was present in the first debriefing with Mr. Dias, and the record will show that she said, look, here's what the facts are. The evidence against you is overwhelming. So unless you win a trial, which is highly unlikely, you need to cooperate. She was there. So it wasn't like Mr. Hart, on his own, went to have a meeting with Mr. Dias. Unless you can win a trial. I'm talking about post-plea. And I'm not sure I understand what the court's question is. No, in terms of cooperating post-plea, that's what you normally do, is post-plea. A lot of times, it's whether or not you get the 5K. Right. But you're describing a pre-plea, because you just said, unless you can win a trial, you better cooperate. That's a pre-plea. Yes, the first interview, I do believe, was pre-plea. Not the post-plea. That was the investigation. Investigators. That's right. Right? Let me ask you this question. Did the question of whether or not he was entitled to a downward departure ever make it before a judge? Did he challenge your decision not to do it? He did not. Did you move? So he didn't even raise the question, where's my downward departure? I just can't remember the facts of this case. Yeah, I think at some point of the sentencing, there is an issue of obstruction of justice, which the judge imposed. At some point thereafter, and I can't exactly pinpoint it for the court, there was an issue of the debriefing. The government should give us a debriefing. Yeah, but I'm just wondering, normally, somebody makes a motion. Right. Specific performance is really what it is. A motion to compel the government to file a Rule 35. It's called specific performance. Right. Right. And so, was that done in this case? No, sir. That's normally when you decide it, and then you sit there, and the government goes, he minimized, he did so and so, he did so and so. Sometimes the defendant will object to those facts and say, that's a lie. Sometimes they don't. They just say, I think I still deserve it. But you don't have anything like that. That did not happen at all in this case. Okay. Okay. Thank you. Thank you. When Detective Hart entered the home of Calvin Dyess and his wife on December 28, 1998, he told Mr. Dyess that Mr. Dyess' wife was his, meaning Mr. Hart's, and that Mr. Dyess would never touch his own wife again. You know what his sentence was? I do not. Okay. Mr. Dyess shared this with his attorney. While Mr. Dyess was in the county lockup, but his wife was out, not in prison at all, despite the allegations. Was the question of whether or not your client was entitled to a downward departure motion, was that ever presented to a judge? It was never filed through a motion. No, I said was the question ever presented to a judge? To my knowledge, the question is should he get a downward departure was not phrased that way. Had Mr. Dyess been represented by counsel in his 2255, that might have been, a motion to compel might have been put into that. Unfortunately, Mr. Dyess put together his 2255 motion pro se. Mr. Dyess shared with his attorney what Mr. Hart had said to him the night he was arrested. He shared with his attorney that he was learning from other people in lockup and out on the street that Mr. Hart and Mr. Dyess' wife were being seen in nightclubs together. The attorney reported having hired an investigator, but reporting directly to Mr. Dyess, there was no chance of proving misconduct. The record shows the investigator isn't coming back with any affidavit from any of the people Mr. Dyess is hearing from the street or through prisons have seen the two together. They end up getting married. This is an unusual case where we have a claim of... That's all interesting and terrible facts, but how does that impact, maybe a jury likes to hear that, how does that impact on the legal determination we have to review? One of the claims before the court is counsel was ineffective in failing to bring the misconduct to the government and to the district court before the plea or at the very least before the sentencing hearing. The record shows that Mr. Dyess took this issue directly to the government and the government did nothing. Mr. Dyess is on the record. The record shows Mr. Dyess is taking this to his attorney. His attorney is saying he hires an investigator, but no affidavits or anything are brought back from the investigator to show what we now know is actually true and that is... The investigator didn't discover anything. Despite Mr. Dyess himself being in a prison and unable to investigate anything hearing all this information. You have to take the record where it is and he couldn't find anything. The record shows... And the attorney can't make that stuff up. I mean, how far should he go at that point? We would respectfully submit that the extent of the misconduct in this case... Basically, the evidence was he was seeing her at the clubs or they were together at the clubs. And threatening Mr. Dyess that he would never see her again and that she was the property of the... They're talking about pleas and so forth. There's no evidence that they were going together at that point. I submit that just quoting Judge Hayden would be a good way to couch it. Judge Hayden... I just want to stay accurate with the record. I mean, after that we can debate the legal consequences. I have nothing beyond what I'm telling you. I understand. And he did hire an investigator and the investigator came back and found nothing. What the record shows is the investigator was hired and then nothing. Not that the investigator found anything, that the investigator might have done nothing, that the record does show the attorney was being negative. Oh, we're never going to prove anything like that. Don't worry about that. How are we going to prove something like that? People make that allegation all the time. If you're going to make an argument of misconduct by the attorney, you're going to have to say more than just the absence of things. I mean, we do know he hired an investigator and acted on the information. Yes, Your Honor. Now, that's a pretty serious charge to make against an attorney when he's incompetent for doing that. What happens after, if he went so far as to hire an investigator, if he had heard something or found something, you would assume he would have taken the further step, but you don't have that evidence. Well, yeah, we don't have anything to say beyond an attorney hires an investigator, but then complete silence, other than the negativity from the attorney saying, we'll never find anything. Complete silence is because you don't know. Correct. And then followed up with proof that they're a couple by March 1999, when she's getting this great deal and she's staying out of jail, where Calvin dies as pleading guilty, not knowing that saying the drug amount was 50 grams or more means he's going to get life when the indictment doesn't have a drug amount, and the law would eventually say because the indictment... He was told he was going to get life, but when they talked about the drug amounts, 1.5 kilograms, he was told it was 20 to life, and that was repeated. He understood that. Incorrectly, because it's a Rule 11 violation because Apprendi applies to his case and the correct statutory range is 0 to 20. Apprendi had not been decided then. And that means his plea was unintelligent and involuntary and unknowingly because he didn't know the correct statutory range. Thank you. He knew that with 1.5 kilograms, he would get 20 to life. That was the risk. Correct. That is still the risk. The defect is that the indictment didn't contain it, but he wasn't misinformed. We present that... or submit that it's the defect that the indictment didn't say it and that he did not know at the time. He did know. He was told it. He was told incorrectly. The judge told him directly. You're exposing yourself. You understand that by pleading to 1.5 kilograms, you're exposing yourself to 20 to life. Yes, sir. That's correct. And that was repeated. And we submit... Okay, now that's nothing. There's no error there. Until Apprendi comes out and shows that that's a Rule 11 error. Thank you, Your Honors. All right. Mr. Brandt, I guess you're court-appointed. Okay, I want to recognize service. We'll come down and greet counsel and take a short recess. Mr. Connell, the court will take a brief recess.
judges: Paul V. Niemeyer, Roger L. Gregory, Dennis W. Shedd